Guadalupe **LUCERO**, as Next Friend of Adan Lucero; Susan Ensley, as Next Friend of Jacob Ensley; Cassandra Sanches, as Next Friend of Veronica Sanches; Maria Nunez, as Next Friend of Rossie Nunez; Maria Garcia, as Next Friend of Candido Garcia; Susana Montano, as Next Friend of Daniela Montano, Susana, Montano, and Agustin Antonio Montano; Vera Carrillo, as Next Friend of Alexander Carrillo and Nickalus Gachowski; Debbie Lewis, as Next Friend of Amanda Lewis, Florence Lewis, Lisa Lewis, and Matthew Lewis; Lori Micallef, as Next Friend of Michael Micallef and Jessica Micallef; Maria Barajas, as Next Friend of Gabriela Barajas; and Marl Holt, as Next Friend Heather Tuck, On Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

**DETROIT PUBLIC SCHOOLS**, a Municipal Corporation, Board of Education of the City of Detroit, a Municipal Corporation, and Dr. Kenneth Burnley, Individually and in his Official Capacity, Jointly and Severally, Defendants.

No. 01–CV–72792–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 30, 2001.

Thomas W. Stephens, Goodman, Lister, Detroit, MI, Patricia Mendoza, Ruperto R.

Alba, Chicago, IL, Julie H. Hurwitz, Alma L. Lowry, Detroit, MI, for Plaintiffs.

Jerome R. Watson, Clara G. Dequick, Miller, Canfield, Detroit, MI, Steven E. Chester, Michigan Department of Attorney General Environmental Protection Division, Lansing, MI, Lamont D. Satchel, Detroit, MI, for Defendants.

## MEMORANDUM OPINION
## AND ORDER

HOOD, District Judge.

### I. FACTS

Plaintiffs filed the cause of action in the Eastern District of Michigan on July 26, 2001. Plaintiffs allege Defendants Detroit Public Schools ("DPS"), Detroit Board of Education and Dr. Kenneth Burnley chose to build the new Beard Elementary School on a site that is contaminated. (See Complaint ¶ 25). The Defendants announced in September of 2000, that Beard Elementary School located in Southwest Detroit at 840 Waterman would close in 2001 and a new Beard School would be built on Beard, Green and Chatfield Streets in the City of Detroit ("the Site"). (See Complaint ¶ 29). McMillan Elementary School was also designated to close in the spring of 2001 with a plan to reassign the McMillan students to the new Beard location. (See Complaint ¶ 30).

The parties agree that the old Beard School lacks the proper facilities required such as an auditorium, cafeteria, gymnasium and playground. The McMillan School has experienced a significant decline in enrollment falling below 300 students. Based upon the lack of proper facilities and the decline in enrollment at McMillan, Defendants began to develop a new state of the art neighborhood school. The new Beard Elementary School sits on 6.45 acres in southwest Detroit. The school is scheduled to open on Tuesday, September 4, 2001.

It is alleged that the current Beard student body is comprised of 61% Hispanic and 13% African American. (See Plaintiff's Exhibits B & C). The McMillan student body is made up of 58% African American and 21% Hispanic. (Id.) Plaintiffs contend that African American students and Hispanic students are groups which are protected by Title VI of the Civil Rights Act of 1964 based upon the percentage of African American and Hispanic populations in the Detroit Metropolitan area. (See Plaintiff's Exhibit E) Defendants have not disputed the demographics asserted by the Plaintiffs.

The Site was used for industrial manufacturing, storage and maintenance operations from 1918 through 1964. The new Beard site was acquired by the Detroit Public Schools in 1965. The Site was used by DPS for educational training, vehicle maintenance and limited manufacturing operations until 1978. The DPS thereafter used the Site as a vocational training school known as the McNamara Skills Center until 1986. (See Plaintiff's Exhibit F, Phase I Environmental Site Assessment Report) Plaintiffs state that an underground storage tank ("UST") was housed on the property which has been vacant since the 1986 closing of the Skills Center.

Defendants state that in the late 1990s the Site became the focus of redevelopment. In order to aid in that development, a Task Force was created which included members from the Michigan Department of Environmental Quality (" MDEQ"), Wayne County, City of Detroit, and Southwest Detroit Environmental Vision ("SDEV"), a local environmental organization. The Task Force recommended that the Site be put to productive use.

Plaintiffs claim that Defendants engaged in negotiations with the SDEV and the Task Force to gain custody of the property

through a swap or a direct sale of other properties. Plaintiffs contend that Defendants did not seriously consider an alternative site for a new school. Plaintiffs state that all negotiations ended between the SDEV and DPSwhen the Reform School Board was appointed. It is alleged that a DPS staff person stated at a community meeting that the size of the lot and ownership by DPS was conducive to the quick construction of the school. The Site was zoned M4 which is an Intensive Industrial District. Although the Site was zoned M4, Joseph Graf stated that it was chosen as the Site for the new school because:

To the best of my knowledge there is no other site in that neighborhood of that size that would accommodate a school of 83,000 square feet.... Secondly, the Detroit Public Schools already owns that property and so there was no need to go out and acquire differently given that facts.... Thirdly, when we study the environmental concerns that were indicated in the Brownsville Study [sic], we knew that there were concerns that could be addressed and that site could be made safe for the school site.

See Defendant's Exhibit B, ¶ 8. Plaintiffs allege that the Detroit Board of Zoning Appeals ("BZA") was told that Beard was being built on the Site because the site was large enough to accommodate the school and the site was owned by the Detroit Public Schools. Defendants contend that the BZA found that a new school on the Site would be a "more compatible use to the surrounding development" and would enhance the social, physical and economic well being of the surrounding residential neighborhood.

A study on the prior uses of the Site was conducted by the University of Michigan's School of Natural Resources and Environment in response to concerns from members of the local community and the SDEV. The study revealed a long history of industrial uses and indications that the underground storage tanks might still be present. (See Plaintiffs' Exhibit A) The report generated as a result of the study was allegedly presented to the Detroit Public Schools staff in the spring of 1999 but the staff refused to accept the report as proof of site contamination. SDEV thereafter asked the MDEQ and the Wayne County Brownfield Redevelopment Authority ("WCBRA") to evaluate the level of contamination on the Site and to clean up the Site. In the summer of 1999, WCBRA arranged for a site assessment and historical analysis of the past uses of the Site by AKT Consultants, Ltd. ("AKT") and a determination regarding whether there continued to be contamination. AKT conducted an environmental site assessment and determined that there were recognized environmental concerns and additional environmental investigations were conducted on the Site. The following historical industrial uses were found by AKT:

- manufacturing and assembly of steel, brass, aluminum and other metal products;
- radios and televisions;
- refrigerators;
- paper products;
- textiles and automotive components;
- storage or manufacture of paints, adhesives, lead batteries;
- pharmaceutical goods;
- electrical supplies; and
- military tank components.

Based upon the previous alleged uses of the Site, volatile organic chemicals (VOCs), semi-volatile organic chemicals, petroleum-related materials, polychlorinated biphenyls (PCBs), chlorinated solvents, various heavy metals and radioactive paints were the recognized and potential environmental concerns. In August of 1999, a radiation survey was conducted. A subsurface

investigation was conducted and 56 soil samples were submitted to the EPA for analysis. AKT also performed a partial geophysical survey, a radiation study and soil sampling. (See Plaintiffs' Exhibit J) The samples were tested for VOCs, base neutral acid semi-volatile organic compounds (BNA SVOCs), PCB, pesticides and analyte metals. Several contaminants were found as a result of the sampling: arsenic, lead, PCB, carbon tetrachloride, benzopyrene, benzo(a)pyrene and trichlorethene. The subsurface investigation revealed saturated soils at depths seven (7) to twelve (12) feet below the ground surface, but the test wells yielded insufficient ground water samples. It is alleged that the levels of benzo(a)pyrene, PCB and arsenic were ten to fifty times higher than applicable residential criteria. Plaintiffs contend upon information and belief that the WCBRA reports were provided to Defendants.

It was determined in March, 2000 through an AKT Phase II environmental site assessment that environmental cleanup was needed. Contaminants, which exceeded the generic Residential Cleanup Criteria, were carbon tetrachloride, polynuclear aromatic hydricarbibs (PNAs), PCBs, arsenic and lead, but the contaminants only exceeded the criteria for groundwater. Two anomalies were found near the eastern boundary of the property and a third near the western portion of the Sitewhen a geophysical survey of the Site was conducted in July and August of 1999 to locate underground storage tank locations. When the June 16, 2000 test pit investigation was conducted, two USTs were discovered. The USTs contained some liquids which were low level contaminants but were below the Residential Cleanup Criteria. The liquid was found to be tapped surface water.

Most of Defendants' cleanup activities occurred after the AKT assessment.

AKT, the Detroit Public School Program Manager Team, L.L.C. ("PMT"), and MDEQ, worked together to develop a cleanup and remediation program for the Site. MDEQ was involved to ensure that any remediation would protect human health, safety and welfare, as well as the environment.

Plaintiffs also contend that the investigations conducted by AKT and Defendants were not broad enough. AKT allegedly took soil samples only in areas which had "recognized environmental concerns" and did no sampling or soil gas testing and no investigation of an adjacent railroad bed. Defendants only tested for specific contaminants. Defendants did some additional testing at the request of MDEQ. Twelve (12) soil samples were taken from the footprint (perimeter) of the school building itself. Sixty (60) additional soil samples were taken from the potentially contaminated soil but no in-depth sampling was taken.

Plaintiffs state that the uncertainties of the contamination are evidenced by the February 2001 discovery of two 10,000 gallon USTs, and seven additional locations of elevated PCB levels. Two of the locations had contamination levels almost ten times higher than residential direct contact criteria such that additional soil removal was required. (See Plaintiffs' Exhibit P) During the final soil testing, it is alleged that the residential direct contact criteria was exceeded in nine (9) areas for PCBs, four locations for arsenic, five locations for benzoz(a)pyrene and one location for benzene.

NTH Consultants, an organization which provides infrastructure engineering and environmental services, was selected in July of 2000 to excavate and remove contaminated soils and USTs. Because odors were detected during the removal of the soil surrounding USTs, an additional 120 cubic yards of soil were removed. In re-

sponse, seven confirmatory samples were collected. Ten separate excavations were undertaken initially in an effort to remove pockets of contamination. NTH excavated a 30 foot by 30 foot square area in each excavation. The depth of eight of the excavations was approximately four feet and two of the excavations were approximately ten feet in depth. The initial soil excavations began on July 10, 2000 and were completed on July 25, 2000. However, analytical data revealed that there continued to be contaminants present.

After the completion of soil removal on July 25, 2000, Patricia Thornton, an MDEQ representative and John Russell met with PMT and NTH representatives to discuss the soil removal. Based upon the continued presence of contaminants, John Russell suggested that an engineered cap be installed to prevent human exposure to any remaining contaminants. Engineered caps are composed of pavement, a minimum of six (6) inches of topsoil, or the use of six (6) inches of other landscaping materials. Defendants argue that the use of the engineered cap is a common and accepted practice in Michigan. Defendants argue that MDEQ experts and the Michigan Department of Community and Mental Health ("MDCMH") agree that the engineered cap will protect the health, safety and welfare of proposed students at the new Beard School by reducing potential contact with contaminated soil.

The NTH plan for an engineered cap was approved by MDEQ on October 25 and 26, 2000. NTH oversaw the collection of 28 additional soil samples which were analyzed for 56 different VOCs. The samples were taken from near surface soils (0

to 12 feet) and from deep soils (8 to 10 feet) or from areas where field screening methods had indicated the possible presence of contamination. The screening methods included a photo-ionization detector, visual and olfactory observations. Only one of the 28 samples contained tetrachloroethene and another trichloroethene. Defendants contend that neither was above the Residential Cleanup Criteria.

Another geophysical survey was performed on the entire Site April 4 through 6, 2001. Defendants admit that anomalies remained; however, no metal objects of any significant size remained on the Site. MDCMH conducted a health assessment of the Site following the April, 2001 geophysical survey and concluded:

> The property poses an indeterminate public health hazard ... MDCMH recommends additional sampling to determine if surface soil contains levels of these contaminants that could pose a public health risk. The Detroit Public Schools have proposed that surface soil on the property that will not be covered by buildings and pavement be removed to a depth of one foot. One foot of clean material will then be added to these areas to serve as an exposure barrier to underlying contaminated soil. The proposal provides an adequate remedy, and the MDCMH support it and recommends that it be fully implemented with all appropriate speed.

One to two feet of soil was excavated from the Site from May 15, and July 1, 2001. Following the excavation, testing was conducted of the top three (3) inches of the surface soils as MDCMH recommended in its report.[1] Smits Affidavit,

1. Defendants allege that soil was excavated to a depth of at least 16 inches in the baseball and soccer fields, twelve inches in the remainder of the landscaped areas, 26 inches in the preschool and kindergarten play areas, 16 inches below the top of curb elevations in the curb areas, 8 inches under the on-site and public sidewalks and under the basketball court, 7 inches under the paved walkway, and 11 inches in the parking lot areas. All soil was transported to a licensed type II landfill for disposal under NTH supervision.

¶ 12. A gridding process was used to determine the number and location of additional soil samples to be tested. Smits Affidavit, ¶ 12. A total of 76 samples were taken. Only a few contained levels of contamination which exceeded Part 201[2] direct contact Residential Cleanup Criteria. However, none of the samples exceeded the volatilization to ambient air (inhalation) standard. Defendants assert that the volatilization standard protects children and adults following the installation of the engineered cap. Smits Affidavit, ¶ 12; Venman Affidavit, ¶ 17.

Defendants contend that engineered caps have been used in Michigan in residential and recreational settings extensively such as Harbor Town Marina in Detroit, Rouge Park Sledding Hill in Detroit, University of Michigan North River Front Campus in Flint, Bay Harbor Golf Club in Petosky, playground and sports complex at the former Lyon Township Landfill in South Lyon and the Lansing Soccer Complex. The new Beard Elementary School engineered cap consists of the following:

- the green space areas are covered with permeable plastic fabric and 4 inches of compacted gravel (crushed concrete), covered by 8 inches of clean topsoil.
- the baseball and soccer fields are covered by 8 inches of compacted gravel and 8 inches of topsoil.
- the pre-school and kindergarten playground are covered with 6 inches of compacted sand, a solid 4 inch concrete slab, 4 inches of pea gravel and a cushioning layer of 12 inches of wood mulch.
- the parking lot and sidewalks are covered by 8 inches of compacted gravel covered by 3 inches of asphalt in the parking lot, and 4 inches of compacted sand covered by 4 inches of concrete pavement in the sidewalk areas.
- the building area cap consists of 4 inches of compacted sand, covered by the solid 4 inch concrete slab of the building floor.

See Defendant's Exhibit 2, pp 28–31 and Smits Affidavit, ¶ 16.

It is Defendants' position that MDCMH could not as a matter of fact determine that the Site was a health risk. Defendants allege that the areas where PCBs were identified in excess of direct contact criteria were excavated. Smits Affidavit, ¶ 12. Over 275 different soil samples have been tested for various chemicals. Venman Affidavit, ¶ 6. Over 37,000 tons of contaminant soil have been removed from the Site. Defendants contend that the new Beard school is not a safety risk as long as the cap is constructed and properly maintained.

Defendants claim that in an effort to make certain that there are no exposures to potentially impacted soil, routine inspections of the cap will be performed on a monthly basis. Inspections will be completed by the DPS school maintenance supervisor or other staff members appointed by the building principal. A log of monthly inspections will be maintained in the principal's office. The public will be allowed to inspect the log.

Defendants propose that where an inspection reveals that crushed concrete is exposed, the topsoil will be restored immediately to a thickness of eight inches. If the demarcation layer becomes visible, the crushed concrete or stone will be replaced to a thickness of four to eight inches and then topsoil. If a complete breach is discovered, activities in the area will be sus-

---

**2.** Section 20107a, Part 201 of the Natural Resources and Environmental Protection Act (NREPA 1994 PA 451, as amended). Part 201 allows voluntary remediation and permits different approaches to remediation dependant upon the proposed use of the facility.

pended and the areas will be sectioned off until repairs are made.

An independent environmental expert will be retained to conduct an evaluation to ensure the inspections are conducted correctly. Any deficiencies will be noted in the inspection log and conveyed to the School Principal and the DPS Department of Environmental Health and Safety. Each year, an independent environmental consultant will conduct an in-house training seminar for school staff on how to know when the cap is damaged and to report any problems with the engineered cap.

All construction activities which will potentially affect the engineered cap will require approval by the DPS Department of Environmental Health and Safety. If evidence of obvious contamination is encountered, the DPS' Department of Environmental Health and Safety will be notified. DPS will provide written notification of the contamination of the Site to easement holders of record, utility franchise holders of record, on site workers, construction workers, utility workers and the owners or operators of all public utilities that serve the Site. In addition to the installation of an engineered cap, the Plan, as designed by NTH, includes additional soil testing and the development of a Part 201 Due Care Plan.

Plaintiffs contend that the Due Care Plan developed by DPS to prevent the Beard Elementary School students from being exposed to contaminants is insufficient. The Due Care Plan provides for twelve (12) to eighteen (18) inches of crushed concrete and soil barriers to be placed over the contaminated soils. Monthly visual inspection of the soil and crushed concrete to ascertain whether the crushed concrete becomes visible would be conducted. However, the Due Care Plan provides no plans for periodic soil sampling to ensure that the contaminants are

not moving into the building. Impermeable poured concrete has been placed in the kindergarten and pre-school play areas. In other areas, a semi-permeable geotextile liner has been placed under the crushed concrete.

There was testimony that several construction workers became ill while working on the Site requiring reports to DPS and personal physicians. The construction workers reported severe symptoms of bloody noses, respiratory difficulties, fatigue, diarrhea and liver pain. (See Plaintiffs' Exhibit Q) The illnesses were contributed to the strong smell of petroleum which was reported on the Site. It is also alleged that one of the wives of the construction workers had an unexplained rash. Additional testing of the Site was conducted by the Michigan Occupation Safety and Health Administration ("MIOSHA") and the Defendants. However, the origin of the illnesses are unknown. Plaintiffs allege that laborers, especially Spanish speaking laborers, were not adequately informed of hazardous materials at the Site.

There have been significant reported problems with the remediation and control of the contamination of the Site. It is alleged that in November of 2000, Defendants' contractors or subcontractors brought in arsenic contaminated soil to construct a berm. It is also believed that contractors mixed contaminated soil with clean soil to fill excavations. There have been problems with dust control and the spillage of contaminated soil from trucks leaving the site. It is Plaintiffs' contention that if Defendants are having problems policing employees and contractors during the evaluation, remediation and construction phase, there will be problems implementing the operation and maintenance of the Plan.

Plaintiffs' experts opine that children are more susceptible to environmental toxins based upon their developmental stage, absorption, metabolic, consumption and detoxification rates and periods of prolonged exposure than adults. Arsenic found at the scene is ubiquitous. Arsenic is a human carcinogen and there are no known safe exposure levels. PCBs, also found on the Site, are potential carcinogens, endocrine disruptors and cause potential cognitive disorders and memory loss. (See Plaintiffs' Exhibit W) Lead was also found at the Site. Lead is a neurotoxin, which allegedly impairs cognitive development and learning ability. Plaintiffs contend that there are serious health risks to children particularly in light of the fact that there are allegedly relatively high levels of environmental toxins from industrial uses in the community in conjunction with the lead paint exposures in the City of Detroit.

Plaintiffs further assert that Defendants have deliberately precluded community participation and involvement in the decision making process regarding the Site. The first community meeting was not held until September of 2000 although the decision to build on the Site was made in May 2000. Defendants had already developed and submitted the Due Care Plan and commenced construction. The public meetings were held during the day when parents could not attend and school officials refused to answer questions from citizens. Although a Citizen Review Board was organized with the verbal approval of Defendants, it is alleged that the Review Board has not been allowed to effectively participate in the meetings. Defendants contend that they have been open, receptive and responsive to the comments and concerns of parents. Defendants claim that the meeting in May 2000 was open to the public and attended by members of the community. Another meeting was held in June 2000 to discuss the construction of the new school.

Defendants contend that notice of the September 14, 2000 meeting was given in both English and Spanish, although no documentation of this was provided.[3] MDEQ representatives, Pat Thornton and Lynn Buhl, attended the meeting. The first formal Project Advisory Community Meeting was held on October 2, 2000 to discuss the new school project. Other informal community information meetings were held to inform the community.

On October 24, 2000, Detroit Public School Program Manager Team, L.L.L. ("PMT") representatives met with State Representative Belda Garza to present the new Beard School project. Schleyer Affidavit, ¶ 24. In February 2001, another formal Project Advisory Community Meeting was held to inform the community of the status of the school construction and installation of the engineered cap. Other informal meetings occurred on April 11, May 2, May 9, 2001 at the old Beard School and on April 26 and May 3, 2001 at the McMillan School.

Richard Schleyer, a PMT representative, was periodically available at the old Beard and McMillan Schools to answer questions posed by parents in April and May of 2001. Defendants contend that they received a letter from Plaintiffs expressing their concerns. Plaintiffs admit that they had received and reviewed documents and discussed the project with DPS staff.

Defendants have spent over $1.3 million dollars in addressing environmental and safety concerns at the new Site. Voluntary

---

**3.** On September 7, 2000, CEO Kenneth Burnley did send a letter to parents of prospective Beard School students assuring them he intended to provide a clean and environmentally safe school.

cleanup of the site was undertaken with the knowledge and concurrence of MDEQ. Defendants contend that they have been provided with $350,000 to be used in construction of a barrier at the Site. Over 275 different soil samples have been taken and over 37,000 tons of contaminated soil have been removed from the Site. Over 2.6 feet in depth of soil have been removed.

DPS claims that it supported Plaintiffs' formation of the Citizen Review Board and agreed to other conditions posed by Plaintiffs. Defendants state that they attempted to resolve any concerns raised by Plaintiffs as outlined in a July 25, 2001 letter to Plaintiffs' counsel. Defendants agreed to:

1. The selection of an independent environmental consultant to advise on the need for additional testing and/or evaluations, if any;

2. Conduct an increased level of contaminant monitoring through established periodic inspections and thorough testing protocols;

3. Determine if groundwater exposure or migration is an issue beneath the site;

4. Record regular monitoring and maintenance activities and make all such records and reports publicly available at the school in both English and Spanish;

5. An independent consultant's evaluation of precautions undertaken with respect to the adjacent railroad tracks, effects of flooding on the cap and potential damages from tree roots;

6. The creation of a Citizen Advisory Committee; and

7. Delay the opening of the school until September 4, 2001.

Plaintiffs did not respond to the July 25, 2001 letter from CEO Burnley but instead on July 26, 2001, Plaintiffs filed a Complaint against the Detroit Public Schools, the Board of Education of the City of Detroit and Dr. Kenneth Burnley. On August 6, 2001, Plaintiffs filed this Motion for Preliminary Injunction. On August 13, 16 and 17, 2000, the Court heard oral arguments and the testimony of witnesses on behalf of Plaintiffs and Defendants. Supplemental affidavits and exhibits were filed on August 15, 16 and 20, 2001.

## II. *STANDARD OF REVIEW*

■ A district court must consider the following factors when deciding whether to grant a preliminary injunction:

I. The likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim;

II. Whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief;

III. The probability that granting the injunction will cause substantial harm to others; and

IV. Whether the public interest is advanced by the issuance of the injunction.

*Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994). A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issues. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985). A finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction, where the movant has at minimum shown serious harm which decidedly outweighs any potential harm to the defendant if the injunction is issued. *Gaston Drugs, Inc., v. Metropolitan Life Ins., Co.*, 823 F.2d 984, 988 n. 2 (6th Cir. 1987). The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that

must be met. *Washington*, 35 F.3d at 1099. No single factor will be determinative as to the appropriateness of equitable relief. *In re DeLorean*, 755 F.2d at 1229. The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). To obtain a preliminary injunction, the plaintiff not only has to demonstrate specific harm, but also carry the burden of persuasion, showing a likelihood of success on the merits. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). The demonstration of a mere 'possibility' of success on the merits is not sufficient, and renders the test meaningless. *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir.1987). The movant must, at a minimum, show "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendants if an injunction is issued." *In re DeLorean*, 755 F.2d at 1228.

## III. *ANALYSIS*

### A. Probability of Success on the Merits

Plaintiffs' legal theories in this cause of action are, first, that Defendants' actions have created a disparate impact based upon race or ethnicity in violation of 34 C.F.R. 100.3(2)-(3). The United States Department of Education has the right pursuant to 42 U.S.C. § 602 to implement Title VI of the Civil Rights Act of 1964. *South Camden Citizens in Action v. New Jersey Dept. of Environmental Protection*, 145 F.Supp.2d 505 (2001). Such rights are enforceable under 42 U.S.C. § 1983. Secondly, Plaintiffs contend that Defendants' actions have violated Plaintiffs' Fifth and Fourteenth Amendment rights to be free from unreasonable interference with their liberty interest in bodily integrity. *Doe v. Claiborne County*, 103 F.3d 495, 506 (6th

Cir.1996); *Wilson v. Webb*, 869 F.Supp. 496, 497 (W.D.Ky.1994).

Defendants contend that Plaintiffs are unable to satisfy the prerequisites of a preliminary injunction. Defendants contend that Plaintiffs cannot succeed on the merits for three reasons: (1) federal funding was not utilized in the site preparation or construction of the new Beard School; (2) Section 1983 does not create a right of enforcement for Title VI; and (3) Plaintiff cannot identify the favor and disfavored groups essential to a claim of discriminatory treatment.

### 1. 42 U.S.C. § 1983

█ In order to sustain a Section 1983 claim, a plaintiff must meet two basic requirements: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct must have deprived the plaintiff of a right, privilege or immunity secured by the Constitution or the laws of the United States. *Wilder v. Virginia Hospital Assoc.*, 496 U.S. 498, 501–08, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

### a. Persons Acting Under Color of State Law

Plaintiffs contend that Defendants are state-created entities or employees of a state-created entity. Plaintiffs state that the basis of the Complaint is the official actions of employees who made decisions on behalf of the Detroit Public Schools.

█ Municipalities and local officials sued in their official capacities are considered "persons" for § 1983 purposes. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a municipality cannot be held liable under a *respondeat superior* theory. A municipality can only be held responsible under Section 1983 when execution of a municipality's

policy or custom inflicts the alleged injury. *Id.* at 690–95, 98 S.Ct. 2018. Plaintiffs named the Detroit Public Schools, the Board of Education of the City of Detroit and Dr. Kenneth Burnley, both in his official and individual capacities, as Defendants.

A school district that has a pupil membership of at least 100,000 is a first class school district. M.C.L. 380.402. There is no dispute that the School District of the City of Detroit has a membership of at least 100,000. All powers and duties of the school board of a first class school district and of its officers are subject to Part 5a. M.C.L. 380.449. Part 5A, P.A.1999, No. 10, became effective on March 26, 1999. Prior to the enactment of the School Reform Board statute in 1999, the Board of Education of the School District of the City of Detroit could be sued. M.C.L. 380.401(3). M.C.L. 380.373(1) suspended the powers and duties of the elected school board until such time a new school board is elected, if a new school board is elected under M.C.L. 380.375. Once a chief executive officer has been appointed, all provisions applicable to the old elected school board apply to the chief executive officer. M.C.L. 380.373(4). "[T]he chief executive officer accedes to all the rights, duties, and obligations of the elected school board." M.C.L. 380.373(4). The chief executive officer has the right to prosecute and defend litigation. M.C.L. 380.373(4)(c). The *school reform board* is subject to the provisions of the Act only "until the appointment of a chief executive officer." M.C.L. 380.373(3).

■ There is no dispute that a new school reform board has been appointed or that Dr. Kenneth Burnley has been appointed as the Chief Executive Officer of the School District of the City of Detroit. Based on M.C.L. 380.373, the Chief Executive Officer is the suable entity in this action. The entities "Detroit Public Schools" and the "Board of Education of the City of Detroit" are not legal entities against which a suit can be directed. See *Pierzynowski v. Police Dep't of the City of Detroit,* 941 F.Supp. 633, 637 n. 4 (E.D.Mich.1996); *Haverstick Enterprises v. Financial Fed. Credit,* 803 F.Supp. 1251, 1256 (E.D.Mich.1992); *Alexander v. Beale Street Blues Co., Inc.,* 108 F.Supp.2d 934, 947 (W.D.Tenn.1999); and Fed. R.Civ.P. 17(a)(every action must be prosecuted against the real party in interest). Plaintiffs have not cited any provisions that designate either the Detroit Public Schools or the Board of Education of the City of Detroit as a legal body corporate capable of being sued.

Defendants contend that Defendant Burnley cannot be liable under 42 U.S.C. § 1983. Defendants assert that there have been no allegations of direct involvement by Dr. Burnley in the events that establish Plaintiffs' claim. There have been no allegations that Dr. Burnley authorized any custom or policy, or violated any environmental law or regulation.

Plaintiffs reply that a single decision by a municipal officer can constitute a policy when that official has the final authority to establish municipal policy with respect to the action ordered, and the official has made a deliberate choice to follow a course of action from among various alternatives. *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 1000 (6th Cir.1994). Plaintiffs state that Dr. Burnley's decision to build an elementary school on a known contaminated site while providing minimal remediation subjects him to liability.

■ Dr. Burnley, in his official capacity, when sued for injunctive relief would be a person under Section 1983 because official capacity actions for prospective relief are not treated as actions against the state. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105

L.Ed.2d 45 (1989). As noted above, M.C.L.A. § 380.373(4) provides that Dr. Kenneth Burnley is the decision maker and suable entity on behalf of the school district.

### b. Violation of a Federal Right
### i. Right of Action Under Title VI

■ In order to enforce Title VI pursuant to Section 1983, Plaintiffs must satisfy a three prong test: (1) whether the provision that is sought to be enforced was intended to benefit the plaintiffs; (2) whether the right asserted is not so "vague and amorphous" that its enforcement would strain judicial competence; and (3) whether the provision at issue unambiguously imposes a binding obligation to the State. *Blessing v. Freestone,* 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

Plaintiffs contend that *South Camden* is dispositive in this case. The *South Camden* plaintiffs sought a preliminary injunction to prohibit the issuance of an air emission permit to locate a cement manufacturing facility in South Camden. The district court issued a preliminary injunction stating that the facility would likely cause a significant adverse impact on the minority community in violation of Title VI. Although the facility met the National Ambient Air Quality Standards, the court barred the issuance of the permit until a full cumulative impact analysis was conducted.

Plaintiffs assert that the United States Supreme Court in *Alexander v. Sandoval,* 531 U.S. 1049, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) held that Section 1983 was available to enforce violations of Title VI regulations. Plaintiffs state that the Sixth Circuit has held that regulations have the force of law which may create rights enforceable under Section 1983. *Loschiavo v. City of Dearborn,* 33 F.3d 548, 552 (6th Cir.1994); *Wood v. Tomp-*

*kins,* 33 F.3d 600 (6th Cir.1994); *Levin v. Childers,* 101 F.3d 44, 47 (6th Cir.1996).

Defendants contend that 42 U.S.C. § 1983 does not create substantive federal rights. Defendants contend that Plaintiffs must assert a violation of a federal right. *Blessing,* 520 U.S. at 340, 117 S.Ct. 1353. Defendants rely on *Alexander* for the proposition that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 601." Defendants distinguish *South Camden* upon which Plaintiffs rely. Defendants state that the court in *South Camden* concludes that the Section 602 regulations are enforceable under Section 1983 because the court assumed a federal right and ignored the dispositive distinction between Sections 601 and 602.

Defendants note that the *Sandoval* Court stated:

> We therefore begin (and find that we can end) our search for Congress's intent with the text and structure of Title VI. Section 602 authorizes federal agencies "to effectuate the provisions of [§ 601] ... by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d–1. It is immediately clear that the "rights-creating" language so critical to the Court's analysis in *Cannon* of § 601, see 441 U.S. at 690 n. 13, 99 S.Ct. 1946, is completely absent from § 602. Whereas § 601 decrees that "no person ... shall ... be subjected to discrimination," 42 U.S.C. § 2000d, the text of § 602 provides that "each Federal department and agency ... is authorized and directed to effectuate the provisions of [§ 601]," 42 U.S.C. § 2000d–1. Far from displaying congressional intent to create new rights § 602 limits agencies to "effectuating" rights already created by § 601. And the focus of § 602

is twice removed from the individuals who will ultimately benefit from Title VI's protection. Statutes that focus on the person regulated rather than the individuals protected create "no implication of an intent to confer rights on a particular class of persons." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). Section 602 is yet a step further removed: it focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating.

Defendants contend that whether there is an implied cause of action under the statute is a different inquiry from whether the statute is enforceable under Section 1983. Defendants contend that the implied right of action is a four element inquiry, while enforceability under Section 1983 is a two stage analysis with a four-element first stage described in *Blessing,* 520 U.S. at 340, 117 S.Ct. 1353. Defendants contend that the absence of rights creating language in Section 602 precludes establishing the first element of *Blessing.*

Plaintiffs contend the Title VI regulations were intended to benefit Plaintiffs in light of the fact that the regulations were enacted to protect and benefit members of racial, ethnic and national origin minorities. In support of their contention, Plaintiffs cite 34 C.F.R. § 100.1:

> [n]o person in the United States shall; on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving Federal financial assistance from the Department of Education.

Plaintiffs, secondly, contend that the regulations are sufficiently defined to allow for judicial review citing 34 C.F.R. § 100.3(b)(2)-(3):

> (2) A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program ... may not ... utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin ...;
>
> (3) In determining the site or location of a facility, an application or recipient may not make selections with the effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any programs to which this regulation applies, on the ground of race, color, or national origin ...

Plaintiffs contend 34 C.F.R. § 100.3(b)(2)-(3) prohibits programs which receive federal funds from operating in a manner which have a disparate impact on racial, ethnic or national origin minorities. *Elston v. Talladega County Bd. of Ed.,* 997 F.2d 1394, 1407, n. 14 (11th Cir.1993); *United States v. LULAC,* 793 F.2d 636, 648 n. 35 (5th Cir.1986); *City of Chicago v. Lindley,* 66 F.3d 819, 828–29 n. 12 (7th Cir.1995); *Larry P v. Riles,* 793 F.2d 969, 982 n. 9 (9th Cir.1984). Based upon the long history of the prohibitions against disparate impact, Plaintiffs contend that the above regulations cannot be considered so "vague and amorphous" as to strain judicial competence.

Plaintiffs claim that Defendants misconstrue and misinterpret the substantive law governing Plaintiffs' claims. Plaintiffs state that the regulations to Section 602 of Title VI create federal rights which are enforceable under 42 U.S.C. § 1983.

Defendants are correct in their contention that there is no private right of action to enforce disparate impact regulations promulgated under Title VI pursuant to

Section 602. *Alexander*, 121 S.Ct. at 1515–23. 42 U.S.C. § 2000d, Public Act 88–352, Title VI, § 601 states:

No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial Assistance.

42 U.S.C. § 2000d, Title VI, § 602 provides that:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.

■ Section 601 bans intentional discrimination and provides persons with a private right of action to enforce that statute. *Alexander*, 121 S.Ct. at 1523. In contrast, Section 602 does not include a private right of action to enforce disparate-impact regulations promulgated under Title VI. *Id.* The Supreme Court stated that "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of person'" explaining that Section 602 neither focuses on the individuals to be protected nor on the funding recipients being regulated, but on the agencies that will do the regulating. *Id.* at 1521 citing *California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981).

■ While the United States Supreme Court proscribed a private right of action under Section 601, it did not do so under 42 U.S.C. § 1983. When determining whether a federal statute creates an individual right of action under Section 1983, a court must utilize the three part analysis articulated in *Blessing*, 520 U.S. at 340—41, 117 S.Ct. 1353 (1997) which states: (a) Congress must have intended that the provision in question benefit the plaintiff; (b) the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence; and (c) the statute must unambiguously impose a binding obligation on the States.

■ Plaintiffs claim that Section 602 was intended to protect and benefit members of racial, ethnic and national origin minorities citing *Cannon v. University of Chicago*, 441 U.S. 677, 693–94, 704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). That is, Congress must have intended by Section 602 to create a federal right in favor of plaintiff. Section 602 requires all federal agencies administering any grant-in-aid program to see to it that there is no racial discrimination by any school or other recipient of federal financial aid. *United States v. Jefferson County Board of Education*, 372 F.2d 836 (5th Cir.1966). Plaintiffs contend that there is a binding obligation on states to ensure that federally funded programs do not create an adverse disparate impact on the basis of race. Plaintiffs contend that the Department of Education statutes are phrased in mandatory terms such as "shall" and "may not".

There is a question, however, with respect to whether agency regulations such as Section 602 creates rights within the meaning of Section 1983. There is a split among the circuits regarding whether agency regulations alone create a federal

784

right.[4] The United States Supreme Court, however, stated in *Wright v. City of Roanoke*, 479 U.S. 418, 432, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), that the Department of Housing and Urban Development ("HUD") regulations created rights enforceable under Section 1983 because they conferred benefits on tenants, which were sufficiently specific to qualify as enforceable rights. The Sixth Circuit citing *Wright* stated that "federal regulations have the force of law, [and] ... likewise may create enforceable rights." *Loschiavo v. City of Dearborn*, 33 F.3d 548, 554 (6th Cir.1994). In *Chrysler Corp. v. Brown*, 441 U.S. 281, 301–303, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the Supreme Court stated that agency regulations have the force and effect of law if they: (1) are substantive, meaning they function as a "legislative type rule" which affects individual rights and obligations; (2) Congress granted the agency which issues the regulations the authority to promulgate such regulations; and (3) the regulations were promulgated in accordance with any procedural requirements imposed by Congress.

Section 602 regulations have the full force and effect of law in that they were issued under a congressional directive to regulate by way of grant, loan or contract, other than a contract of insurance or guaranty, the use of federal funds. Congress gave the agencies the authority to issue rules and regulations consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. Pursuant to the *Chrysler* inquiry, Section 602 has the full force and effect of law.

As stated by the Supreme Court in *Wilder*, there can be little doubt that Title VI of the Civil Rights Act, and implementing regulations promulgated pursuant to Section 602 of the Act, were intended to benefit persons of color such as Plaintiffs who are Hispanic and African American. In *Cannon*, the Supreme Court stated that Congress' objectives were to avoid the use of federal resources to support discriminatory practices and to provide individual citizens effective protection against discriminatory practices.

The Title VI provisions are not vague and amorphous but clearly state that discrimination based upon race, color or national origin should not be the basis for exclusion or the denial of benefits of any program or activity receiving Federal Financial Assistance. The statute must unambiguously impose a binding obligation on the states which means the provision must be phrased in mandatory versus precatory terms. Title VI states " [n]o person in the United States *shall,* on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial Assistance."

There is no doubt that Title VI creates a federal right of action pursuant to 42 U.S.C. § 1983 where Plaintiffs, who are African American and Hispanic, were the intended beneficiaries. The right not to be subjected to discrimination based upon race, color or national origin is not vague and Congress has imposed a binding obligation on the states of mandatory compliance.

4. *W.Va. Univ. Hosps. Inc., v. Casey*, 885 F.2d 11, 18 (3rd Cir.1989); *Buckley v. City of Redding*, 66 F.3d 188, 190–192 (9th Cir.1995); *Boatowners & Tenants Ass'n v. Port of Seattle*, 716 F.2d 669 (9th Cir.1983); *Smith v. Kirk*, 821 F.2d 980, 984 (4th Cir.1987); *Former Special Project Employees Ass'n v. City of Norfolk*, 909 F.2d 89,93 (4th Cir.1990); *Harris v. James*, 127 F.3d 993 (11th Cir.1997); *Suter v. Artist M.*, 503 U.S. 347, 363–64, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *Cent. Bank v. First Interstate Bank*, 511 U.S. 164, 178–80, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

### ii. Federal Funding

Plaintiffs contend that the school district is liable "for action taken or directed by the [school district] or its authorized decision maker itself [that] violates federal law...." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Plaintiffs state that the allegations in their Complaint are sufficient to show that Defendants acted with deliberate indifference. Plaintiffs contend that Defendants' decision to open the new Beard Elementary School despite the uncertainties regarding whether there are risks of harm to minor Plaintiffs, the decision to act despite limited information, the refusal to involve parents in the decision making process in a meaningful way and the failure to provide information in Spanish to Spanish speaking parents exhibits a deliberate indifference to the rights of minor Plaintiffs.

Plaintiffs contend that they will likely be able to show that the decisions of Defendants violate Title VI of the Civil Rights Act of 1964. Plaintiffs contend that they can show that Defendants receive federal funding and that the decision to build the new Beard Elementary School on a contaminated site, given the demographics, has a disparate impact based upon race.

Defendants contend that in order to maintain a private right of action under Title VI, Plaintiffs must show that they were victimized by a "program or activity" that received federal funds. *Buchanan v. City of Bolivar Tennessee*, 99 F.3d 1352, 1356 (6th Cir.1996). Defendants claim that although they receive federal funds, no federal funds were used in the site preparation and construction of the new Beard School. Defendants state that the school construction was financed by a Detroit Public School Bond issue. The site preparation and environmental remediation was funded by the same bond issue

and by grants from the State of Michigan and Wayne County. Robert A. Francis, Executive Director of Capital Improvements for Detroit Public Schools, attests that the funds for the new Beard school came from a $1.5 billion bond fund approved by the citizens of Detroit in 1994. See Affidavit of Robert Francis, ¶ 4. An additional $350,000 was provided by the State of Michigan for the construction of the engineered cap. *Id.*

Plaintiffs reply that Defendants have erroneously concluded, as stated in *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 95 F.Supp.2d 723 (N.D.Ohio 2000), that "program" should be defined narrowly. Plaintiffs assert that pursuant to the 1988 amendment of Title VI, the definition of "program" is construed more broadly.

The Court in *Farm Labor* stated that a plaintiff must prove that he was victimized by a "program or activity" that received federal funds. *Farm Labor*, 95 F.Supp.2d at 742 citing *Buchanan*, 99 F.3d at 1356. The terms "program or activity" and "program" mean all of the operations of a local educational agency of the Elementary and Secondary Education Act of 1965, a system of vocational education, or other school system any part of which is extended Federal financial assistance. 42 U.S.C. § 2000d–4(2)(B). Under this definition, an entity falls under Title VI if it is an "operation of" or "part" of an entity described in § 2000d–4a and any part of that entity receives federal assistance. *Graham v. Tennessee Secondary School Athletic Assoc.*, No. 1:95–cv–044, 1995 WL 115890 (E.D.Tenn. Feb. 20, 1995) (unpublished opinion) (citing *Hodges by Hodges v. Public Bldg. Comm'n of Chicago*, 864 F.Supp. 1493, 1507 (N.D.Ill.1994)). The Sixth Circuit in *Horner v. Kentucky H.S. Athletic Assoc.*, 43 F.3d 265 (1994) found in reference to a school's receipt of federal funds

that "Congress has made its intent to extend the scope of Title IX's equal opportunity obligations to the furthest reaches of an institution's programs." The *Horner* Court refused to "defeat that purpose by recognizing artificial distinctions in the structure or operation of an institution." "Program or activity" and "program" is defined in precisely the same manner in Title IX as in Title VI.

Defendant DPS, therefore, is an entity which receives federal funds and is subject to the reach of Title VI.

### iii. Disparate Impact based on Race, Color and National Origin

Plaintiffs contend that their attendance at the new Beard Elementary School would have a disproportionately adverse impact on African American and Hispanic children. The reassignment of the old Beard Elementary and the McMillan students to the new Beard would disproportionately and adversely impact students based on race, color and national origin. African American children make up thirteen (13) percent of the old Beard and fifty-eight (58) percent at McMillan. Hispanic children make up sixty-one (61) percent of the old Beard population and twenty-one (21) percent at McMillan.

Plaintiffs contend Title VI was passed with the goal of limiting and/or eliminating harms such as the exposure of the potential new Beard Elementary students to toxins such as those present on the Site. Plaintiffs state that in order to establish a prima facie case of adverse impact they are required to show "a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities." *New York City Environmental Justice Alliance v. Giuliani*, 214 F.3d 65 (2d Cir.2000). Plaintiffs assert that the facially neutral act is the construction of the new Beard Elementary School and the adverse impact is the risk of exposure to the African American and Hispanic students who will be enrolled. Plaintiffs state that the attendance at the new Beard Elementary School places an unreasonably high risk of exposure to contaminants on minority students in violation of the Department of Education regulation pursuant to Title VI.

Plaintiffs state that if a comparison is to be made between the students at the new Beard Elementary school and other groups, the comparison should be made to the state-wide school population. It is Plaintiffs' position that because the Detroit Public Schools became controlled by the Governor of the State of Michigan in the 1999 School Reform, it is appropriate to compare the demographics of the new Beard students with other students in the state of Michigan. A comparison with the students of the Detroit Public Schools would be inappropriate because the group is overwhelmingly minority. Therefore, Plaintiffs contend that the comparison should be made with state-wide students or at the very least with students in the tri-county area. In the tri-county areas (Wayne, Macomb and Oakland), African Americans make up twenty-four (24) percent of the population and Hispanic comprise two (2) percent. Even with the tri-county comparison, Plaintiffs contend that the impact of attending school on a contaminated site falls disproportionately on minority students.

Plaintiffs also compare the new Beard Elementary students to the population in the Detroit Public School district and find that even with such a comparison the proposed students of the new Beard school would be adversely impacted. It is alleged that both Beard and McMillan Elementary Schools have a higher population of Hispanics than other Detroit Public Schools.

It is Plaintiffs' contention that given the Defendants' failure to fully characterize the Site, the potential inadequacies of De-

fendants' remediation, the potential inadequacies of the remediation plan, the failure to monitor soil and air on a continuous basis and the inability to police contractors and employees, creates an unreasonably high risk of significant danger to the students attending the new Beard Elementary School.

Defendants contend that Plaintiffs cannot make a showing of disparate impact in this case. Defendants state that there are not identifiable favored and disfavored groups in that Plaintiffs are both minority and non-minority children. The children are comprised of nine (9) Hispanics, one (1) African America and ten (10) Caucasians. In order to have a disparate impact claim, Defendants state that there must be a decision that differentiates or discriminates between two groups or persons. Defendants contend that the decision regarding the location of the new Beard Elementary School would have impacted the same two groups or persons regardless of the site selected.

Defendants further state that Plaintiffs must establish a causal connection between a facially neutral policy and a disproportionate impact on minorities. *New York City Environmental Justice Alliance,* 214 F.3d at 69. Defendants state that "when the disparate impact model is removed from the cases involving clearly delineated policies of employers, it becomes so vague as to be inapplicable." *Spaulding v. University of Washington,* 740 F.2d 686, 708 (9th Cir.1984). In the case at bar, Defendants contend that where there is no allegation by Plaintiffs that there is a policy of discrimination by the Defendants with regards to the new Beard Elementary School, the disparate impact model is removed. Defendants state that this is particularly true where Defendants have allegedly complied with all applicable state and federal requirements.

Defendants contend that they have exercised no judgment that can be viewed as a pretext for discrimination. Defendants claim that they made a business decision to build a new, state-of-the-art neighborhood school on the best available site not in an effort to discriminate.

Defendants state that there is no causal connection between the decision of the Defendants regarding the location of the new school and any alleged discriminatory impact. It is Defendants' position that much of Plaintiffs' proofs consist of broad conclusory statements rather than actual evidence. Defendants state that Plaintiffs' assertions that because the Beard population consists of minority students, Defendants must have engaged in discrimination in deciding on the Site is not evidence of discrimination. Defendants contend that Plaintiffs' attempt to compare students outside of the Detroit Public Schools is inappropriate because Defendants have no control over decisions in other school districts. Defendants also state that they did not have an option to locate the school in another area in Detroit or outside of Detroit.

Defendants argue, that because the new Beard was built to accommodate the students in Southwest Detroit Beard area, the school could not have been built in any other neighborhood or community in the District or Southeastern Michigan. It is Defendants' position that the location of an elementary school is "not of the sort that Judges are well equipped to resolve intelligently or that we should lightly assume has been given to us to resolve by Title VII or the Constitution." *American Fed'n of State, County and Mun. Employees v. Washington,* 770 F.2d 1401, 1402 (9th Cir. 1985).

Defendants claim that the fact that the Detroit Public Schools already owned the land on which the school is located is a

legitimate nondiscriminatory reason for Defendants' actions. Defendants state that clean up was already underway when the decision was made to build the new school. Defendants contend that the Site is in the middle of one of the fastest growing neighborhoods in Detroit and they chose the best site available for the new school. Defendants point out that there have been no alternative sites proposed by Plaintiffs.

Plaintiffs reply that Defendants' analysis relies on disparate treatment instead of disparate impact. Plaintiffs contend that intent is not the issue in a disparate impact case but the focus is whether neutral policies or decisions adversely impact one group where there is no business necessity. Plaintiffs contend that Defendants' decision to build Beard on a contaminated site will adversely and disproportionately impact African American and Hispanic children by exposing them to an unreasonable risk of exposure to toxins. Plaintiffs contend that Defendants fail to provide a substantial legitimate justification for building on the contaminated site. Plaintiffs assert that there were less discriminatory alternatives such as building on another site, conducting soil removal or delaying the opening of the school until air monitoring could occur.

 The elements of a disparate impact claim under Title VI's regulations are substantially similar to those applicable in an employment discrimination action under Title VII of the Civil Rights Act of 1964. *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1417 (11th Cir.1985). The issue is whether a challenged practice has sufficient adverse racial impact—in other words, whether it falls significantly more harshly on a minority racial group than on the majority— and, if so, whether the practice is nevertheless adequately justified. *Id.* at 1417.

In order to carry the burden of showing an adverse racial impact, a plaintiff must establish a prima facie case by demonstrating that the challenged policy or practice has a discriminatory impact on minority children. *Larry P. by Lucille P. v. Riles*, 793 F.2d 969, 981–82 (9th Cir.1984). At the justification stage of a disparate impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate goals of the defendant. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Although there is no requirement that the challenged practice be 'essential' or 'indispensable', a mere insubstantial justification will not suffice. *Id.* at 659, 109 S.Ct. 2115. Defendant must produce a business justification for his practice. However, the burden of persuasion remains with the disparate impact plaintiff. *Id.* at 659–60, 109 S.Ct. 2115.

The question is whether Plaintiffs have demonstrated that a facially neutral policy is causally related to an adverse disparate impact on their race, color or national origin. Plaintiffs must show that the Defendants' decision to build on a contaminated site has subjected them to adverse exposure to unreasonable risks of exposure to contaminants. It is undisputed that thirteen (13%) of the old Beard children and that fifty-eight (58) percent of the McMillan children are African American. Hispanic children made up sixty-one (61) percent of the old Beard population and twenty-one (21) percent at McMillan. Therefore, the children who will attend the new Beard Elementary school will be overwhelmingly minority.

Plaintiffs ask this Court to compare the students with the new Beard with the state-wide school population based upon the 1999 School Reform in which the De-

troit Public Schools became controlled by the Governor of the State of Michigan. This Court, however, declines to do so because Plaintiffs must show that the decision of Dr. Burnley will have an adverse impact upon the children of the new Beard school. Plaintiffs have not shown that the Governor of the State of Michigan was the decision maker with respect to the location of the new Beard school. It is Plaintiffs' contention that Dr. Burnley was the decision maker. This Court notes that there was testimony by Brian Smits that, while he had never constructed a brand new school on a contaminated site, multiple USTs have been removed from schools in Birmingham, Monroe and Howell in the last eight years. Mr. Smits testified that the Birmingham, Monroe and Howell sites were cleaned to residential standards. Beard Elementary school is not the only Michigan school where contaminants were found on the land.

■■■ Plaintiffs have not shown that they are likely to prevail on the merits of showing that the decision of the Defendants adversely impacted the new Beard students. First, Plaintiffs cannot make out a prima facie disparate impact claim if the evidence tends to show that even had the Defendants not engaged in the challenged practice, the same disparate impact would nonetheless have existed. *United States v. Lowndes County Board of Education*, 878 F.2d 1301 (11th Cir.1989). Racial imbalance in public schools amounts to a constitutional violation only if it results from some form of state action and not from factors, such a residential housing patterns, which are beyond the control of state officials. *Id.*

Defendants are not responsible for the racial make-up of the population of elementary students who live within the new Beard elementary school boundaries. The racial makeup of the new Beard population is based upon the residential housing patterns in southwest Detroit.

### iv. Disparate Impact Based on Status as Children

■■■ Plaintiffs seem to also argue that Defendants' action to build the new Beard school adversely impacts children as a group. The Court notes that 34 C.F.R. § 100.3(b)(2)-(3), the regulation at issue, does not identify "children" as a group. The regulation states that individuals may not be discriminated against based on race, color, or national origin. The issue of race, color, or national origin has been addressed above. In any event, Plaintiffs have not shown that they are likely to prevail on the merits of showing that there is an unreasonable risk of exposure to children of the new Beard Elementary. Plaintiffs argue that the cap installed by Defendants will not be safe because of the history of remediation and the effects of exposure of contaminants are uncertain. Plaintiffs claim that there is insufficient data to determine how children will react to possible exposure.

Plaintiffs offer the affidavits of Dr. Michael Harbut, physician in chief of the Center for Occupational and Environmental Medicine, whose specialty is problems related to environmental industrial exposure to chemical contaminants. See Plaintiffs' Exhibit 1, ¶ 1. Dr. Harbut has written and spoken on the issues of industrial and environmental toxins which include lead, arsenic, mercury and asbestos. *Id.* at ¶ 7. Dr. Harbut opines that the children of the new Beard will be subjected to unreasonable and unnecessary risk of harm. Dr. Harbut states that exposure to lead is associated with "lowered IQ, learning difficulties, and behavior problems" even at very low levels of exposure. *Id.* at ¶ 12. Arsenic is linked to cancers such as skin, lung, kidney, liver, prostate, digestive system, nasal cavity, bone cancer, leukemia

and lymphoma, respiratory diseases, skin changes, circulatory diseases, diabetes mellitus, neurological disorders, liver and blood disorders, gastrointestinal disturbances, kidney diseases and irritation of mucous membranes of the respiratory system. *Id.* at ¶ 13. PCBs are associated with developmental delays in infants, disruption of hormone function, adverse growth and intellectual development, memory loss and neurological disorders. *Id.* at ¶ 15.

Dr. Harbut states that based upon the differences in the body sizes of children and adults, children will potentially absorb more environmental toxins because they eat more food, drink more water, breathe more air than adults and engage in hand to mouth behavior more frequently than adults. *Id.* at 21, 22. Dr. Harbut opines that because the state and federal laws target the reactions of adult males, children may not be protected by the existing standards. *Id.* at 23.

It is Dr. Harbut's opinion that a cap to prevent exposure to contaminants is not an effective or less certain option. Dr. Harbut opines that exposure remains possible through direct dermal contact with contaminated soils or the inhalation of contaminated soil particles, if the cap is breached, inhalation of volatile organic chemicals emitted through the barrier to the outdoor air and inhalation of volatile organic chemicals emitted through the barrier to the indoor breathing zones of children.

Plaintiffs also offer the opinion of Dr. William B. Weil, professor emeritus in the Department of Pediatric and Human Development at the College of Human Medicine at Michigan State University. Plaintiffs' Exhibit W, ¶ 2. Dr. Weil stated that he has worked extensively on the issue of environmental health threats to children and taught pediatric medicine for twenty-six (26) years. Dr. Weil testified that he reviewed some reports and opines that the contaminants found on the Beard School site can be extremely harmful to children. *Id.* at ¶ 10. It is Dr. Weil's position that arsenic, lead and polychlorinated bipheyls (PCBs) have been associated with neurological damage. Lead has been associated with lowered IQ, learning difficulties and behavioral problems at very low exposure levels. PCBs have been associated with memory loss and other cognitive difficulties and are also recognized as endocrine disruptors. Arsenic is a known carcinogen. *Id.* at ¶ 10. Dr. Weil opines that exposure to environmental toxins during infancy and early childhood can lead to permanent and irreversible effects. *Id.* at ¶ 12. Based upon the size, body composition, differences in metabolic rates, and the fact that children eat more food, drink more water and breathe air, Dr. Weil contends that children are at greater risk of exposure to environmental contaminants. *Id.* at ¶¶ 13 & 14. Dr. Weil attests that the impact of cumulative and interactive exposures and other health stresses such as poverty and poor nutrition may negatively impact children. *Id.* at. ¶ 17. Dr. Weil contends that the Michigan environmental standards are inadequate to ensure protection of children that there is significant uncertainty as to "safe" exposure for levels for children. *Id.* at ¶ 19. Dr. Weil also expresses concern that construction of playground equipment with pressure treated wood would increase the children's exposure to arsenic. *Id.* at ¶ 21. Although the "likelihood of exposure would be greatly reduced" by the construction of the engineered cap, Dr. Weil states that additional safeguards and precautions should be taken to protect against exposure. *Id.* at ¶¶ 23 & 24.

The Analysis of the Michigan Department of Environmental Quality's Administered Environmental Standards to Protect Children's Health states that the current

risk assessment methodologies utilized by the MDEQ closely corresponds to those currently used by the United States Environmental Protections Agency (USEPA). See Plaintiffs' Exhibit 2. The standards and methodologies are being continually re-evaluated and refined based upon new scientific information as it becomes available. *Id.* Children are taken into consideration where data is available for the specific contaminant under consideration. *Id.* The uncertainties due to the absence of data obtained from children and younger animals has lead to the consideration, at least for pesticides, of the use of an additional safety factor over and above the default certainty facts currently used in the MDEQ or USEPA standard regulatory risk assessment methodology. There are also studies from pharmaceutical companies that children are not always more sensitive than adults and that the current safety factors are protective of sensitive populations such as children. The Michigan Environmental Board has found that there is not a compelling scientific rationale for the universal application of an additional, distinct safety factor to account for exposures to infants and children.

Catherine Simon, supervisor for the Toxic Unit of the Michigan Department of Environmental Quality Air Division, testified that the screening levels which are established in Air Toxic Rules are generally protective of public health in Michigan as a whole, but that the provisions regarding the routes of exposure may be of concern. Plaintiffs' Exhibit 3, p. 32. However, she expressed concern that the screening levels and the risk assessment process may or may not be adequate to protect the public when it comes to inhaling pollutants.

Plaintiffs also argue that Defendants' behavior during construction does not bode well for their attention to safety from exposure. As an example, in February of 2001, workers complained of experiencing rashes, tiredness, diarrhea, bloody noses, liver pain, and shortness of breath. Samples of soil were taken from the trenches where the workers were working. NTH also performed air monitoring. Personal air sampling devices were placed on workers. At depth samples were taken from the trenches. No detectable volatile compounds were found. Only one sample was over residential criteria. There was one instance of carbon monoxide. Nothing was found to support the illnesses reported by the workers.

Crescencio Longoria, an employee of the Michigan Industrial Group, was assigned to work at construction sites in December of 2000. Mr. Longoria testified that he worked at the site for 3 months. When Mr. Longoria began working when the iron frame of the building had been erected. Mr. Longoria had contact with the entire site because he was in charge of receiving materials on site. Mr. Longoria also prepared the ground for cement using heaters in order to prevent the freezing of the ground. It was also Mr. Longoria's responsibility to remove the snow.

It was Mr. Longoria's testimony that while the Michigan Industrial Group did have orientation regarding tools, machinery and the specifics of his job duties, he was never told that there was contamination on the property. He stated that he was never given any written instructions regarding how to protect himself from the contaminants or given protective clothing. Mr. Reuben Jimenez, a supervisor for the Michigan Industrial Group, testified that he read the pertinent parts of the orientation packet to Mr. Longoria in Spanish which contained instructions on how to deal with soil contamination. Mr. Jimenez admitted that he read only portions of the orientation packet to Mr. Longoria. His explanation of what he read and his man-

ner of translating was woefully inadequate. Mr. Longoria admitted that Mr. Jimenez read the orientation packet to him but insisted Mr. Jimenez never mentioned anything about soil contamination. Although it was winter, Mr. Longoria stated that he did not wear long sleeves at the site because he was working with the heaters. Mr. Longoria stated that there were no washing facilities on site. It was a common practice for Mr. Longoria to eat his food at the site, sitting on the ground.

Mr. Longoria testified that he was contacted by the company he worked for and told that workers on site had become ill. Mr. Longoria was encouraged to seek medical attention because he had worked with the dirt. Mr. Longoria testified when he left the Site daily, he went home, wearing the same clothes from the construction site. Neither the Defendants nor any of the contractors advised Mr. Longoria that he should keep his construction site clothes away from his family. Mr. Longoria stated that his family suffered different illnesses throughout the winter. Mr. Longoria testified that he personally experienced frequent summer colds.

As a result of Mr. Longoria's experience, Plaintiffs argue that they cannot rely on Defendants to maintain the Site or to provide notification of potential exposure.

Defendants contend that Plaintiffs are unable to show that the decision to place the new Beard Elementary school on a contaminated site will have an adverse effect on African American and Hispanic children. Defendants argue that they have complied with all applicable EPA and Michigan Environmental laws. It is Defendants' position that Plaintiffs have offered only speculation regarding what could happen, but fail to show that any environmental law has been violated.

Defendants contend that Plaintiffs have failed to satisfy the causation element by failing to connect the decision of the De-

fendants with any adverse impact on children. Significant testimony regarding the effects of exposure to contaminants on children, the number of soil samples taken and the results, removal of known contaminated soil and the installation of a barrier was presented. Defendants also offer the testimony and affidavits of Brian Smits and Bradley Venman.

Mr. Venman, an environmental toxicologist for NTH Consultants, Ltd., testified that over 37,000 tons of contaminated soil was removed from the entire site at an average depth of 2.6 feet. See Affidavit of Bradley Venman, ¶ 5. Mr. Venman attests that over 275 soil samples from different areas on the site have been tested for heavy metals, volatile organic chemicals, semi-volatile organic chemicals, polynuclear aromatic hydrocarbons and PCBs. *Id.* at ¶ 6. It is Mr. Venman's opinion the quantity of soil samples taken from the Site exceeds what is normally done for brownfield sites in Michigan. *Id.* at ¶ 7.

Mr. Venman testified that the cleanup criteria for soil established under Part 201 take into account the potential exposure by accidental exposure which could occur through indoor dust. *Id.* at ¶ 9. Part 201 criteria for soil assumes ingestation of 200 milligrams (mg) of soil per day by children up to age 6 and 100 mg of soil per day for older children and adults on a daily basis for thirty (30) years. *Id.* Exposure to skin surfaces for 245 days per year for 30 years is also assumed. *Id.* Mr. Venman states that Part 201 was developed to protect persons during childhood, adolescence and adulthood for a continuous 30 year exposure period. *Id.* at ¶ 9. Since the only potential for injury occurs when there is exposure by touch, ingestion and/or inhalation, Mr. Venman contends that by limiting or reducing exposure is an effective means of reducing overall health risks. *Id.* at ¶ 10. As long as the contaminated soils

have been maintained beneath a barrier, exposure risks decrease. *Id.*

Mr. Venman testified that he has experience with engineered caps in both residential and recreational settings in Michigan. *Id.* at ¶ 11. The most common types of engineered caps are pavement, a minimum of 6 inches of topsoil, or inches of other landscaping materials including engineered caps maintained in the Harbor Town Marina, the Rouge Park Sledding Hill, the University of Michigan North River Front Campus, the Bay Harbor Golf Club, the playground and sports complex at the former Lyon Township Landfill in South Lyons and the new Lansing Soccer Complex. *Id.* It is Mr. Venman's contention that the engineered cap at the new Beard far exceeds the engineered caps currently in place in residential and recreational areas in Michigan. *Id.* at ¶ 12. The specifications for the new Beard engineered cap are as follows: the green space areas are covered with permeable plastic fabric and 4 inches of compacted gravel (crushed concrete), covered by 8 inches of clean topsoil; the baseball and soccer fields are covered by 8 inches of compacted gravel and 8 inches of topsoil; the pre-school and kindergarten playground are covered with 6 inches of compacted sand, a solid 4 inch concrete slab, 4 inches of pea gravel and a cushioning layer of 12 inches of wood mulch; the parking lot and sidewalks are covered with 8 inches of compacted gravel covered by 3 inches of asphalt in the parking lot, and 4 inches of compacted sand covered by 4 inches of concrete pavement in the sidewalk areas; and in the building areas, the cap consists of 4 inches of compacted sand, covered by the solid 4 inch concrete slab of the building floor. *Id.* at ¶ 13. Mr. Venman attests that Defendants' Due Care Compliance Plan approved by the MDEQ has a detailed inspection, maintenance and repair program to maintain the cap in good condition. *Id.* at ¶ 14. Mr. Venman contends that the "engineered cap does not pose an unacceptable risk to human health, safety or welfare, or the environment and will effectively protect school children" at Beard. *Id.* at ¶ 17.

Patricia Thornton, a geologist for the Michigan Department of Environmental Quality, testified that the barrier as constructed will be protective of public health and safety if maintained as currently planned based upon a revised Due Care Report submitted on July 25, 2001. Affidavit of Thornton, ¶ 6.

Brian Smits, vice president of environmental redevelopment services of NTH, a registered Professional Engineer and a certified Underground Storage Tank Professional, oversees a staff of 30 who conduct site testing and tank removals. Mr. Smits testified at the preliminary injunction hearing that he has been involved with the Site since June of 2000. He asserted that he was familiar with the sampling of soil done at the Beard school site. Mr. Smits testified that far more sampling has been done at the Site than at other sites.

The first sampling done by AKT was conducted in June or July of 1999. The sampling was geo-probe sampling. Geo-probe sampling is conducted by pounding a hollow steel pipe into the ground and extracting the pipe containing the soil impacted from 18 inches to 2 feet. Samples were collected throughout the 12 feet depth and two of those samples were analyzed. The soil samples were tested for over 170 contaminants such as pesticides, PCBs, organic volatiles. The square areas on the Exhibit B of Mr. Smits' Affidavit are locations where DPS asked to have soil excavated based upon AKT borings. The areas were identified for excavation based upon AKT results. Contamination was detected and soil was excavated as a result.

Field screenings were used during the excavation. Mr. Smits' staff used oratory

senses to smell and other machines to locate any volatiles. The screenings were expanded and an additional 85 samples were taken from the 11 square mile site. The work was performed in July of 2000. No structures were erected at that time. Confirmatory samples were taken and arsenic which exceeded the residential criteria was found. The results were presented to DPS in August of 2000 at a meeting with Rick Schleyer and NTH staff. A decision was made to put a protective cap over the site.

In October of 2000, geo-probe sampling of 14 feet was conducted of the footprint (within the boundary of the building) of the proposed building. Two samples each were taken from 14 borings. The residential inhalation samples were below the residential criteria.

Underground storage tanks, which were discovered during the digging of a fire hydrant, were removed from the site in February 2001. Mr. Smits testified that it is not uncommon to find the tanks during construction because the records are not well kept. Soil samples were collected after the tanks were removed. Soil samples were taken from the bottom of the site of the USTs and some from walls. No compounds exceeding the applicable Part 201 generic residential clean up criteria were found. However, the soil around the tanks was removed and taken to a licensed landfill located primarily in Woodland Meadows and Carlton. Thereafter, Defendants requested an additional geo-physical survey. AKT performed a geophysical survey, targeting locations where tanks were suspected based upon historical records. The survey was conducted in all areas except under the building which was already in place. Mr. Smits testified that he did not have any concerns regarding whether tanks remain under the school building because any underground tanks are generally located during construction.

No underground metal structures of any significant size were detected.

Soil sampling was done pursuant to a request made by MDEQ in June and July of 2001 to sample soil under the new cap. The goal was to sample the soils that would first be encountered if the cap was ever breached. Samples were taken after the Site was excavated to the preliminary grades. One to three feet of soil had already been removed and a foot of clean material was installed. The sampling occurred from an average of 1 to 3 feet over the original grade.

The Michigan Department of Community Health (MDCH) assessed the data and suggested surface sampling of soil under the cap. MDCH concluded that "the property poses a indeterminate public health hazard ... MDCH recommend[ed] additional sampling to determine if surface soil contains levels of contaminants that could pose a public health risk. The Detroit Public Schools have proposed that surface soil on the property that will not be covered by buildings and pavement be removed to a depth of one foot. One foot of clean material will then be added to these areas to serve as an exposure barrier underlying contaminated soil. The proposal provided an adequate remedy, and the MDCH supports and recommends that it be fully implemented with all appropriate speed." See Affidavit of Smits, ¶ 20. Seventy-six samples were analyzed for 185 contaminants based upon the concerns raised by the parents. MDEQ took their own samples and tested for a range of contaminants which included arsenic and PCBs. MDEQ indicated that testing for 185 contaminants was not necessary but recognized the need to satisfy the parents. The purple diamonds on Exhibit B denote the samples taken. The cap, however, was already in place when MDEQ results were received. There was a meeting with DPS

in which the decision was made to remove the areas based upon MDEQ's results. Four additional excavations were conducted to remove PCBs. NTH took 285 samples and MDEQ took over 30. Mr. Venman testified that he did not believe that additional sampling was necessary.

Mr. Venman opined that soil gas testing is not necessary. Soil gas testing is performed by driving a filter into the soil and the filter collects gases that come out the soil. It is used as a screening tool not a clean-up tool. Field screening and soil gas testing is similar.

Mr. Venman testified that the cap will be fully effective and because of the cap the children will be safe attending school. The pre-school area cap is maintained more conservatively because the DPS wanted to be conservative. Robert Francis, the Executive Director of Capital Improvements for Detroit Public Schools, recommended the configuration. Mr. Venman suggested that protective caps have been used in other areas but are not as comprehensive in Chene Park, St. Aubin Amphitheater and Harbor Town. The cap is usually composed of six (6) inches of topsoil on top of contaminated land.

In conclusion, Mr. Smits testified that he does not believe that a child could get through the cap. The maintenance plan will be ongoing and not meant to be static. Defendants claim all of this evidence shows there is no unreasonable risk of being exposed to contaminants and therefore, no adverse impact.

Throughout these proceeds, Plaintiffs have relied heavily upon the *South Camden* case. In *South Camden,* there was testimony that the addition of the cement processing facility would aggravate the preexisting health problems of the community. A study of the community revealed that:

a. Age adjusted cancer rate for black females was higher that 90% of the rest of the state;

b. Age adjusted cancer rate for black males was higher than 70% of the rest of the state;

c. The rate of cancer was significantly higher for black males than for white males;

d. Age adjusted rate of death of black females in Camden county from asthma was over three times the rate of death for white females from asthma in Camden county; and

e. Age adjusted rate of death of black males in Camden County from asthma was over six times the rate of death for white males from asthma in Camden County.

There was additional testimony that self-reported asthma for the Waterfront South residents was 33%, more than twice the self-reported asthma in other parts of the City of Camden. Problems with coughing and catching their breath affected 61% of the Waterfront south residents compared to 36—39% of the residents of North Camden. Forty-eight percent of the Waterfront south residents experienced tightness in their chests as a symptoms as compared to 23% of the North Camden residents.

Unlike the *South Camden* plaintiffs, the Plaintiffs in the case at bar have been unable to provide this Court with concrete evidence of harm to the students. This Court concludes that the Plaintiffs have failed to demonstrate that permitting the new Beard Elementary School to open will likely subject the children to an unreasonable risk of exposure to contaminants.

**2. Substantial Legitimate Justification**

Even assuming that Plaintiffs were able to show a disproportionate ad-

verse effect, once the prima facie showing is made, a defendant must prove that a "substantial legitimate justification is a pretext for discrimination." *Elston*, 997 F.2d at 1407. If defendant meets this burden, plaintiff still may prevail by demonstrating that a "comparably effective alternative practice which would result in less disproportionality" exists, or that the "defendant's proffered justification is a pretext for discrimination." *Id.*

Defendants contend that they made a business decision to build a new, state-of-the-art neighborhood school on the best available site, not in an effort to discriminate. Defendants contend that because the new Beard was built to accommodate the students in the Southwest Detroit Beard area the school could not have been built in any other neighborhood or community in the District or Southeastern Michigan. Plaintiffs reply that administrative ease is the justification for Defendants' decision to choose a contaminated site. Plaintiffs contend that there are many less discriminatory alternatives such as building on another site, performing an actual soil removal or postponing the opening of the new school until follow-up monitoring can demonstrate the barrier is effective.

In Title VI disparate impact cases in the educational context, defendants attempt to meet the "substantial legitimate justification" burden by demonstrating the "educational necessity" of their practices, that is, to show that their challenged practices "bear a manifest demonstrable relationship to classroom educations." *Georgia State Conference*, 775 F.2d at 1418. An educational necessity is an action that is necessary to meet an important educational goal. *Id.*

In *Elston*, plaintiffs challenged the school board's decision to place a new school in a white community. Plaintiffs stated that minority students were affected in three ways: (1) that blacks were denied the benefit of a new school in their community; (2) that black children were stigmatized by the message that their community was not worthy of hosting a school that whites would attend; and (3) that the siting left the Training School, which was in the black neighborhood, in constant risk of closure, impairing its ability to offer a full curriculum to its students. *Elston*, 997 F.2d at 1412. The defendants claimed that they could not place the new school at the Training School because adequate land expansion was not available at the Training School. Plaintiff suggested the consolidations of elementary grades at the Training School in order to create sufficient space or constructing new elementary facilities at the site. The Court stated that "because of the lack of adequate land for expansion at the Training School site, placing the new school somewhere besides at the Training School site was necessary to achieving a legitimate, important goal integral to the Board's educational mission: the goal of building the school." *Id.* at 1413.

In the case at bar, there has been significant testimony regarding the conditions which necessitated the building of a new facility in the Beard and McMillan neighborhood. Dr. Carlos Lopez, Executive Director of Student Achievement in Southwest Detroit for the Detroit Public Schools, testified that the old Beard was built for 315 students. During the 2000—2001 school year, 565 to 578 students were enrolled. The school had portable classrooms which were added in the last year and a half. The children did not have access to speech assistance and social work support because there was no space. The school lacked a kitchen and gymnasium. Lunch was eaten in classrooms and a room was designated for play because the playground area was used for parking. Staff conditions and space for the union steward were dismal.

Joseph Graf, Program Director of the Detroit Public School Program Manager Team, testified in his deposition that the Site was appropriate for the new school.

To the best of my knowledge there is no other site in that neighborhood of that size that would accommodate a school of 83,000 square feet.

Secondly, the Detroit Public Schools already owns that property and so there was no need to go out and acquire differently given that fact.

Thirdly, when we study the environmental concerns that were indicated in the Brownsville Study [sic], we knew that they [sic] were concerns that could be addressed and that site could be made safe for the school site.

See Affidavit of Joseph Graf, ¶ 8.

It is undisputed that there is a desperate need for the new school. The new school is approximately four blocks from the old Beard. There has been testimony that there is no other place that would accommodate a school the size of new Beard. Ms. Vera Carillo, the parent of Plaintiff Alexander Carillo and a concerned activist parent, even testified that she was excited about the new school because the old Beard was substandard and overcrowded.[5] There was also testimony that the new school sits on 6.45 acres of land, the actual physical structure covering 2 acres. The new Beard school was also built in response to a fast growing Hispanic population in southwest Detroit. Defendants needed to build a school which would accommodate the needs of the community.

Although Plaintiffs contend that an alternate site would have been more appropriate, Plaintiffs do not identify another site within the community of southwest Detroit that would have accommodated a school the size of the new Beard. The court in *Elston* held that, "since plaintiffs have proffered no other alternative sites, they have not met their ultimate burden of proof." *Elston*, 997 F.2d at 1413.

Based on the foregoing, Plaintiffs have not shown that they are likely to prevail on the merits and Defendants have offered a substantial legitimate justification for their decision which Plaintiffs have not rebutted.

### 3. Substantive Due Process Rights

Plaintiffs contend that their substantive due process rights have been violated pursuant to the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs allege that Defendants have unjustifiably caused Plaintiffs to be deprived of fundamental rights or liberty interests. *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir.2000). Plaintiffs allege that public school students have a substantive due process right to be reasonably protected from known risks of harm by public school districts and their supervisory officials. *Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir.1996). Plaintiffs allege that mere negligence is insufficient and that an official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir.1997). Plaintiffs contend that the analysis is the same under the Michigan Constitution.

Plaintiffs allege that Defendants' decision to build the new Beard Elementary School on a contaminated site with limited evaluation and remediation, no continuing monitoring and wholly ineffective public participation has created a substantial risk of bodily harm to the students who are

---

**5.** Ms. Carillo told the Court that there were no circumstances under which she would send her child to the new Beard School.

assigned to the new school. It is alleged that Defendants' actions evidence a deliberate indifference to the risks and potential bodily harm of the students.

In bringing a claim for deprivation of a substantive due process right, Defendants contend that Plaintiffs must establish deprivation of a constitutional right and then show that the Defendants are responsible for the violation. *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Defendants contend that Plaintiffs' claim is speculative. Defendants contend that Plaintiffs speculate that the students will be deprived of their liberty interest in bodily integrity in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 17 of the Michigan Constitution. Defendants assert that Plaintiffs' claim that the students will be exposed to environmental contaminants which could result in bodily harm where the school is located on a remediated and capped former industrial site are speculative.

Defendants argue that Plaintiffs have not offered any case law which supports Plaintiffs' right to be free from exposure to contaminants. In *Adelung v. Township of Jackson*, No 79–2613, 1982 U.S. Dist. LEXIS 18183 (October 18, 1982, D.N.J.), a landfill polluted the groundwater and the drinking wells of the plaintiffs and invaded the body causing harm. The court found no deprivation of any rights secured by the Constitution stating:

> The plaintiffs' description of the effects of chemicals in their water as a violation of their right to bodily integrity sufficient to violate a liberty interest under the Due Process Claus in the circumstances of this case stretches the right to "personal security" to unrecognizability. No case we have seen takes the right so far; nor, we believe, is there any sound reason for doing so.

Defendants assert that Plaintiffs are asking this Court to expand the scope of the recognized right of personal security to encompass an entirely new category of rights. Defendants argue that the cases relied upon by Plaintiffs do not support an expansion of rights. Plaintiffs cited *Doe, supra* and *Wilson v. Webb*, 869 F.Supp. 496 (W.D.Ky.1994). Both cases involve the physical fondling or assault/rape of girls by schoolteachers. Defendants claim that Plaintiffs have not offered any compelling reason to expand the scope of the fundamental right of personal security to include "bodily integrity."

Plaintiffs reply that Defendants' reliance on *Adelung* is misplaced because the case is unpublished and not binding on the Sixth Circuit. Plaintiffs state they have a constitutional right to bodily integrity and the right to be free from exposure by contaminants.

The liberty interests preserved by the Due Process Clause of the Fifth Amendment, later incorporated into the Fourteenth Amendment, include "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded ... than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). Although threats to personal security usually arise in the context of government imposed punishment or physical restraint, courts have not limited protection of this historic interest to those settings. *Winston v. Lee*, 470 U.S. 753, 764–66, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). Indi-

viduals have "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity, and this right is fundamental the magnitude of the liberty deprivation that [the] abuse inflict upon the victim ... strips the very essence of personhood." *Doe*, 103 F.3d at 507. The Sixth Circuit has recognized that children have a substantive due process right to be free from harm. *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476 (6th Cir.1990)(in state regulated foster homes); *Webb v. McCullough*, 828 F.2d 1151 (6th Cir.1987)(student has a right not to be battered by school personnel).

Substantive due process serves "as a check on official misconduct which infringes on a 'fundamental right' or as a limitation on official misconduct, which although not infringing on a fundamental right, is so literally 'conscience shocking.' hence oppressive, as to rise to the level of a substantive due process violation." *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir.1996). The test is whether the conduct complained of "shocks the conscience" of the court. *Mertik v. Blalock*, 983 F.2d 1353, 1367–68 (6th Cir.1993). Plaintiffs, in the case at bar, premise their claims on a violation of a constitutionally protected liberty interest, within the meaning of the Fourteenth Amendment, in their personal bodily integrity.

In *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 725 (6th Cir.1996), the Sixth Circuit stated that while a student has a Fourteenth Amendment right to personal security and bodily integrity, there must be a showing that the "force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than merely careless or unwise zeal that it amounted to a brutal and inhuman abuse of official power literally shocking to the conscience." Plaintiffs alleged that the teacher/coach sexually harassed and physically abused children. The court reasoned that while the teacher/coach's slap of a student was "careless and unwise", the behavior fell "far short" of "brutal," or "inhuman," or any of the other adjectives employed to describe an act so vicious as to constitute a violation of substantive due process. *Id.* at 726. Accepting all of plaintiff's allegations as true, the action of the teacher while deplorable, was "not of the outrageous and shocking character that is required for a substantive due process violation." *Id.* at 726.

This Court finds that while Plaintiffs have a right to personal security and bodily integrity, there has been no showing that Defendants' actions were based upon malice or sadism. Defendants' actions fall short of the "outrageous and shocking character that is required for a substantive due process violation" particularly where the harm at this point to the students of the new Beard school is speculative at this point.

Plaintiffs argue that ineffective public participation has created a substantial risk of bodily harm to the students who are assigned to the new Beard School. Parents claim they learned of the new school construction in September of 2000 or later. Plaintiffs' witnesses testified that they were not informed that the school would be constructed on a contaminated site. The first DPS community meeting was held in February 2001 and there was discussion of the contamination at the Site and whether the school would be safe for children in general. Other community meetings followed. Defendants claim that notice of these meetings was distributed in both English and Spanish, however, no notices were presented to the Court. Following the February 2001 meeting, it is undisputed that Rick Schleyer was present at both the old Beard and McMillan on

alternate Wednesdays to answer the questions of parents. It appears to the Court that although some information was provided to the community, many parents were not adequately informed. Nor is it clear what efforts were made by Defendants to ensure that Spanish speaking parents had the opportunity to review printed materials in their first language. Even though information dissemination and the community participation could have been handled in a more effective manner, Plaintiffs have failed to show that ineffective community participation resulted in a deprivation of the Plaintiffs' substantive due process right.

### B. Irreparable Harm

Plaintiffs request a preliminary injunction to preclude the opening of the new Beard elementary school and, in the alternative, request that the school not open until Defendants conduct the evaluation, remediation and continuing monitoring necessary to eliminate unreasonable risks of exposure to environmental contaminants. Plaintiffs state that attendance at the Site would be a loss of the students' constitutional rights. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984).

Plaintiffs contends that attendance at the new Beard Elementary School will subject the students to toxins which will likely have a permanent and devastating effect on the children's long term health. Such threat of exposure is irreparable harm. Plaintiffs cite *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) where the Supreme Court stated:

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction. . . .

Plaintiffs allege that they are likely to suffer harm before a decision is rendered on the merits. *Puerto Rico Conservation Foundation v. Larson,* 797 F.Supp. 1066 (D.Puerto Rico 1992). Plaintiffs admit that the irreparable injury must be actual and imminent rather than speculative and remote in time. Plaintiffs contend that our most precious resource, our children, will be harmed by the opening of the new Beard Elementary School without proper monitoring, remediation and evaluation.

Plaintiffs point out that although they have been unable to quantify the risks of injuries or illnesses which may result if an injunction is not issued, this Court should not assume that the illnesses will not occur. Plaintiffs claim that the standards which have been met by Defendants apply to adults and not children. Plaintiffs claim that "[u]ncertainties regarding the nature of exposure, specific vulnerability and variability among children, and limited knowledge about the toxicities of chemicals and complex mixtures makes it difficult to determine the extent of links between environmental exposures." (See Plaintiffs' Exhibit W, Joel A. Tickner & Polly Hoppin, Children's Environmental Health: A Case Study in Implementing the Precautionary Principle, 6 Int'l J. Envtl. Health 281 (2000)).

Defendants contend there can be no injury to Plaintiffs based on the siting and building of the new Beard Elementary. Because Plaintiffs allegedly cannot demonstrate a likelihood of success, there is no per se irreparable injury.

Defendants further contend that Plaintiffs' injuries are not irreparable where Plaintiffs waited more than one year after the decision to build on the Site and construction began at the present Site to seek injunctive relief. Defendants cite *Miller v. California Pac. Med. Ctr.,* 991 F.2d 536, 544 (9th Cir.1993) for the contention that a

"long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." Defendants contend that Plaintiffs waited 33 days before the start of the school year to file the present action. Plaintiffs have failed to cite violations of environmental regulations. More-over, the state regulatory agencies have been consistently involved in the clean-up process. Defendants contend that they have agreed to perform more extensive periodic testing and monitoring of the site. Defendants contend that Plaintiffs will not be harmed by waiting until this mater is adjudicated to determine if an injunction should issue.

Defendants argue that they will experience significant harm if an injunction is issued because the students will not be able to begin school in the new school. Defendants claim that they have done everything required by the applicable statutes, state and federal regulations. MDEQ and MDCMH were involved in the process and approved actions taken to safeguard the health and safety of students and staff. Defendants state that it is not the role of the Court to promulgate environmental regulations or to second guess the state and federal agencies charged with enforcement of environmental laws.

A showing of "probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (internal quotations and citations omitted). "[A] mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins.,* 934 F.2d 30, 34 (2d Cir.1991). To constitute irreparable harm, an injury must be certain, great, and actual. *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985). Irreparable harm cannot be speculative;

"the injury complained of [must be] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.;* see also *Regan v. Vinick & Young,* 862 F.2d 896, 902 (1st Cir.1988) ("[s]peculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction").

In *Miron v. Menominee County,* 795 F.Supp. 840, 846 (W.D.Mich.1992), the district court found that plaintiff's injuries were remote and speculative and did not constitute the sort of imminent harm which would warrant preliminary injunctive relief, interfering with an environmental remediation plan approved by a state court. Plaintiff alleged that the type of design of the landfill cover to be installed at the construction of a landfill was inadequate. Plaintiff contended that an environmental impact statement was necessary to reveal the inadequacies of the FAA funded remedial action plan. The court stated that plaintiff's injuries were speculative and merely theoretical. There was no affirmative evidence that plaintiff's ground water or local fish would be adversely affected by the presence of hazardous or toxic waste in the landfill. The effect of contamination was minimized by the fact that his well had been sealed.

In *Christie—Spencer Corp., v. Hausman Realty Co.,* 118 F.Supp.2d 408 (S.D.N.Y.2000), plaintiff moved for a preliminary injunction requiring a tenant to fully remediate all contamination at the site resulting from the subtenant's operation of a dry cleaning business. The court stated that plaintiff was asking the court to declare that the cleanup mechanism chosen by Defendant and approved by the Department of Environmental Conversation ("DEC") for use at the site posed an imminent and substantial danger because it would not adequately clean the remain-

ing soil, bedrock or groundwater contamination, if there was any. The court declined to grant a preliminary injunction. The court stated that soil vapor extraction was an approved remedy for the type of contamination found on the site. The DEC had approved the use of soil vapor extraction and the overall cleanup would remain subject to oversight by DEC and other regulatory agencies. Seventy-two tons of soil had already been removed and the experts opined that the removal of another 450 tons would undermine the foundation of the building or other adjacent buildings.

 This Court finds that Plaintiffs have failed to show irreparable harm where remediation has occurred, and the engineered cap is in place, Defendants will adhere to a Due Care Compliance Plan and Defendants have further agreed in a letter of July 25, 2001 to increased monitoring and periodic investigations and the retention of an Independent Environmental Consultant to develop short and long term monitoring plans. Where the non-movant has taken remedial action, the balance of harms is readjusted because the potential for harm to the movant has been eliminated. *Heather K v. City of Mallard,* 887 F.Supp. 1249, 1260 (N.D.Iowa 1995) citing *Burndy Corp. v. Teledyne Indus., Inc.,* 748 F.2d 767, 774 (2d Cir.1984) (holding that injunctive relief was "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL mark into compliance with UL standards and where there was not a likelihood of repetition or hazard to the public). Present harm as the result of past misconduct is not sufficient to justify the injury to the nonmovant of granting preliminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of preliminary injunction." *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 490 (8th Cir.1993). There has been testimony by witnesses that if the cap is properly maintained and inspected, it is an effective way to prevent exposure. Defendants have taken and analyzed soil samples, removed contaminated soils, and completed subsurface and geotechnical investigations. Defendants have agreed to allow Plaintiffs to provide a list of 3—5 reputable environmental firms, one of which will be chosen by the Defendants, to suggest additional testing and/or evaluations and to be an integral participant in developing a long term sampling and monitoring plan. Defendants have agreed to conduct a soil gas survey around the perimeter of the building and to repeat the testing on a quarterly basis for the first year. The cap will be inspected on a monthly basis to identify and repair any damage. An independent environmental consultant will conduct an audit of the cap on a yearly basis. The independent consultant will also be consulted if there are ground water issues. Reports and records will be available to the public at the new Beard location in both English and Spanish. The independent consultant will evaluate adjacent railroad tracks and the berm constructed to prevent storm water runoff, and flooding concerns which would cause any contaminants to rise to the surface and any plans to plant trees or shrubs which might breach the cap. Defendants have agreed to an eleven member Citizen Advisory Committee which would report to Dr. Rodgers on issues of communicating of strategies, examination of testing and monitoring documents and examination the Consultant's recommendations as well as providing advisory recommendations. Lastly, Defendants agreed to pay for these activities.

### C. Balance of Harms

Plaintiffs contend that the issuance of a preliminary injunction will maintain status quo. Plaintiffs assert upon the belief that

the proposed new Beard students are currently assigned to other schools and that the teachers have not been ordered to relocate from the old Beard location or McMillan. Plaintiffs contend, that even if assignments have been made, they can be reversed. Plaintiffs argue that the reversal of assignments is a minor inconvenience in comparison to the potential harm of contaminant exposure. Plaintiffs state that the opening of the school is controlled by the Detroit Public Schools. It is Plaintiffs' contention that the evaluation, remediation and monitoring issues should have been resolved in sufficient time prior to the opening of school to allow for an alternate plan if required.

This Court recognizes there is harm to both parties regardless of the decision made by the court. The safety of our children is always a paramount concern, as well as the quality and manner in which they are educated. Ideally, no building, particularly a school should be located on a contaminated site. However, the reality is that contaminated sites do exist and regulatory agencies are charged with setting standards and regulating the cleanup of such sites. Neither party has provided this Court with any evidence that there is an appropriate site on which to build a school for the growing community other than the one chosen. It is undisputed that a new school was necessary.

This Court finds that the balance of harm favors neither party in light of the fact that contaminated soils have been removed, an engineered cap which was approved by the MDEQ was installed and there is a dire need for a larger, state of the art school in the community.

## D. Public Interest

Plaintiffs state that the public has a strong interest in protecting the well-being of children. It is Plaintiffs' position that due to the serious risk of exposure to harmful toxins, a preliminary injunction would be in the interest of the public.

Defendants state that the granting of a preliminary injunction will harm the Defendants as well as the public. Defendants contend that significant resources have been expended to construct the new school. The old school is substandard in many respects and is insufficient to serve the community. Defendants contend that they have exceeded all the applicable laws and regulations and to require them to find other facilities to educate the Beard and McMillan students in less than 25 days would cause substantial harm. Defendants allege that a preliminary injunction would require Defendants to implement an emergency program in order to bring the old Beard and McMillan Elementary Schools up to minimal standards.

Defendants agree with Plaintiffs that environmental concerns are extremely important but argue that educational concerns are equally important. Detroit students have been required to learn in substandard conditions. Defendants contend that the students of Southwest Detroit need not be subjected to an antiquated facility. Defendants contend that substandard conditions have an adverse effect on student performance, the drop out rate and teacher retention. Defendants contend that the harm to the neighborhood children, parents, the Beard Elementary staff and the community outweighs the harm claimed by Plaintiffs.

This Court finds that there is no greater public interest than the safety and the education of children. The public has an interest in protecting children from any potential environmental harm and there are public agencies and funding committed to eradicating hazardous and contaminated sites. There is also a public interest in beginning school in a timely manner. In light of the protection provided by the

engineered cap and the Defendants' July 25, 2001 letter in which the Defendants agree to work with Plaintiffs and citizens in the community to monitor and maintain the potential for exposure to contaminants at the Site, in order to ensure the maximum safety of the children, this Court finds that this factor does not weigh in favor of either party.

## IV. LACK OF STANDING

Defendants argue that Plaintiffs lack standing. In order to have standing, a plaintiff must show that:

1. An injury in fact (an invasion of a legally protected interest) which is concrete and particularized; and actual or imminent, not conjectural or hypothetical;

2. There must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly traceable to the challenged action of the defendant;" and

3. It must be likely as opposed to speculative and the injury must be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Defendants contend that in the context of a Section 1983 claim, Plaintiffs must show that there is a real, concrete and immediate threat of harm. It is Defendants' position that Plaintiffs are unable to show evidence of a real and immediate threat. Defendants contend that the cap, if properly maintained, eliminates any danger of exposure to the proposed Beard students. Defendants contend that its plan addresses the environmental concerns with the approval of agencies charged with the enforcement of laws and regulations for the safety of the public. Defendants argue that no environmental law or regulation has been violated by DPS. As such, Plaintiffs have not suffered any concrete injury and have no standing.

Plaintiffs contend that they have established their standing to maintain this lawsuit. It is Plaintiffs' position that dismissal for lack of standing is inappropriate where proving the harm alleged for standing is equivalent to proving the merits of the case. *City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 243 n. 5, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Holtzman v. Schlesinger,* 414 U.S. 1316, 94 S.Ct. 8, 38 L.Ed.2d 28 (1973).

 To establish standing in federal court, any party bringing a lawsuit must allege an actual case or controversy. *Deshawn E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998). The party seeking to invoke the jurisdiction of the court bears the burden of establishing that he has met the requirements of standing. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future. *City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). At the pleading stage, however, general factual allegations of injury from the defendant's conduct may suffice. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

Accordingly, this Court presumes that Plaintiffs seeking injunctive relief, at the pleading stage, have presented general allegations which embrace specific facts necessary to support their claim. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

## V. CONCLUSION

Plaintiffs' counsel began oral argument claiming this was a case about environmental justice and so it was argued. Environmental justice cases commonly involve a decision to place a facility or landfill, which is hazardous and detrimental to humans, in a place where people of color or low income persons reside (as opposed to in a

community where the families with higher incomes reside). In such cases, it is the facility or landfill which may cause injury to humans. In this case it is not the facility, the school itself that may cause the injury, but the Site at issue which has already been found to be contaminated. The concerns in this case are about where and how a school district should situate a new school, a necessity in this community, in an area already contaminated and whether children should be required to attend a school built on remediated land. These are difficult issues for the school system, parents, children, and environmentalists. In this instance, the Court finds that the Plaintiffs have not, at this point, demonstrated they are likely to prevail under 42 U.S.C. § 1983 on the merits of their current claims. Nor have Plaintiffs shown, at this point, that they are likely to suffer irreparable harm prior to the adjudication of the matter. However, while Plaintiffs' claims of harm are only speculative now, the experts in this case have been careful to indicate that the vigilant monitoring and continued maintenance of the engineered cap at the new Beard School is critical to the protection of the children of this school from exposure to contaminants known to be hazardous to humans over extended periods of time.

For the reasons stated above,

IT IS ORDERED that Plaintiffs' Motion for Preliminary Injunction Docket No.4, filed (July 27, 2001) is DENIED.

IT IS FURTHER ORDERED that the new Beard School may open for classes on Tuesday, September 4, 2001 but may remain open only if the Defendants are in compliance with the amended Due Care Compliance Plan and the agreements outlined by Defendants in their letter of July 25, 2001.

IT IS FURTHER ORDERED that a Status, Scheduling and Settlement Conference be held on this matter on September 10, 2001, 2:00 p.m.